# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN L. SAENZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 13-11685-FDS |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying an application for social security disability insurance ("SSDI") and supplemental security income ("SSI") benefits. Plaintiff Kevin L. Saenz alleges disability based on physical impairments related to his lower back, left knee, and left arm. The Administrative Law Judge ("ALJ") determined that plaintiff retained a sufficient residual functional capacity ("RFC") to perform work existing in the national economy, and thus that he was not disabled under the Social Security Act, 42 U.S.C. § 216(I) and § 223(d).

Plaintiff has moved to reverse the ALJ's decision. He contends that (1) the ALJ failed to consider additional evidence added to the record and (2) failed to give controlling weight to his treating physiatrist's opinions. Defendant has cross-moved for an order affirming the ALJ's decision.

For the reasons set forth below, plaintiff's motion to remand and reverse the ALJ's decision will be denied, and defendant's motion to affirm the ALJ's decision will be granted.

**I.      Background**

**A.      Educational and Occupational History**

Kevin Saenz was born on August 3, 1985. He was 26 years old at the time of his hearing before the ALJ on March 15, 2012. (A.R. 31). He completed the eighth grade, but did not go any further in school. (*Id.* at 31).

From 2001 to the end of 2004, and again in 2008, Saenz worked for Lighthouse Masonry as a manual laborer. From summer 2007 through the end of that year, he worked for A1 Concrete Cutting and Construction as a manual laborer. (*Id.* at 226). At those jobs, he was "on [his] feet and [did] a lot of heavy lifting." (*Id.* at 32). In early 2009, he worked at Niche, Inc. as a stitcher in a factory, where he sewed parachutes using a large commercial sewing machine. (*Id.* at 226). At that job, he stood for the duration of the workday, and did some heavy lifting. (*Id.* at 33, 35). He left that job in April 2009 because of a work-related injury. The alleged disability onset date is April 14, 2009. (*Id.* at 151).

**B.      Medical History**

On April 14, 2009, Saenz sustained a work-related injury while working as a stitcher. He was standing on a table approximately five feet high, and when he attempted to step down onto a smaller table, he rolled backward, striking the back of his upper trapezius and upper neck. He also caught his left arm between the two tables, and hyperflexed his knee while attempting to get up. (A.R. at 343, 372, 400).

That day, he visited St. Luke's Hospital Emergency Room complaining of neck pain and

2

numbness in his left arm. (*Id.* at 270-71, 372). A CT scan of the cervical spine provided no evidence of traumatic injury. (*Id.* at 374). A radiology report demonstrated mild lumbar spondylosis, most pronounced at L5-S1 level, and a Schmorl's node in the superior endplate of L5. (*Id.* at 370).[1] A physician at St. Luke's diagnosed muscular contusions and prescribed Percocet and Ibuprofen. (*Id.* at 271).

On April 15, 2009, Saenz returned to St. Luke's Emergency Room. He reported that the prescribed medications were not dissipating the pain, and that he now felt pain throughout the left side of his body, down his leg. (*Id.* at 387). Matthew Brown, N.P., prescribed Ibuprofen for pain and Flexiril to control knee spasms, and gave him a knee brace and crutches to use as needed. (*Id.* at 385, 398).

On April 16, 2009, Saenz visited St. Luke's Occupational Health Clinic. He explained to Richard Santos, N.P., that he had been experiencing some numbness in his left hand and pain in his left knee and lower back. (*Id.* at 400). Santos noted that Saenz had a "slightly antalgic gait," restricted motion in his neck, and restricted shoulder rotation, but was able to sit in a normal fashion.[2] Santos also concluded that Saenz had suffered from a left neck strain, an upper trapezius strain, a thoracolumbar strain, and a left knee strain. (*Id.* at 401). Santos instructed him to continue taking Ibuprofen and Flexiril, gave him a knee brace, and recommended a home-exercise program. (*Id.*).

Saenz visited Santos again on April 22, reporting "a lot of pain in the upper neck and upper trapezius area with some numbness in the left arm." Santos increased Saenz's Percocet

---

[1] Lumbar spondylosis is degenerative lesion in the lower back. STEDMAN'S MEDICAL DICTIONARY 896, 1456 (25th ed. 1990). A Schmorl's node is a protrusion of a spinal disk into a vertebra. *Id.* at 1059.

[2] An antalgic gait suggests that a patient is walking in a certain manner in order to avoid pain. *Id.* at 65.

dosage, and noted, "I anticipate that this will heal with conservative management." (*Id.* at 403-04). Saenz visited Santos again on April 29, reporting continuing pain in his left knee. (*Id.* at 406).

From April 21 through June 18, 2009, Saenz saw Ryan M. Knowles, D.C., for chiropractic therapy. (*Id.* at 425). Knowles's treatment plan for Saenz included chiropractic adjustments "in order to correct spinal misalignment and to restore bio-mechanical integrity to the spine." (*Id.* at 413). On May 21, Knowles noted that Saenz's neck and lower back pain had diminished since his initial evaluation due to a combination of chiropractic treatment and prescription medication. (*Id.* at 418). He also noted that he considered Saenz to have been "totally disabled from work activities and will remain such for a period of two to four more weeks." (*Id.* at 420). In his June 18 discharge report, Knowles noted a general lack of progress, and that some of Saenz's symptoms had actually worsened over the course of the therapy. (*Id.* at 426). He also noted that he considered Saenz to be "totally disabled" from April 14 through June 18. (*Id.*). He diagnosed (1) cervical radiculitis and cervicalgia related to cervical disc protrusion and cervical sprain/strain injury, (2) lumbar radiculitis and low back pain related to moderate lumbar sprain/strain injury, and (3) ongoing post-traumatic left knee pain. (*Id.* at 427).[3]

Knowles referred Saenz to Sergey Wortman, M.D., a physiatrist. Dr. Wortman first saw Saenz on May 4, 2009. (*Id.* at 343). During an examination of his knee, Saenz reported pain in the medial portion of the left knee joint, in the inferior pole of the left patella, and due to bilateral displacement of the patella. (*Id.* at 344). During examination of his lower back, he reported pain

---

[3] Radiculitis is inflammation of a spinal nerve root. *Id.* at 1308. Cervicalgia is neck pain. *Id.* at 280.

4

on extension and compression. (*Id.*). Examination of his left arm revealed swelling in the lower third of his forearm, and a limited range of motion. (*Id.* at 345). During examination of his neck, Dr. Wortman noted limited rotation on the left and rigidity due to pain. (*Id.*). Dr. Wortman noted that Saenz appeared "not in acute distress but rather discomfort." (*Id.* at 344). He recommended an MRI of the left knee, and prescribed Medrol and Relafen. (*Id.* at 345-46). He also noted: "It is my medical opinion to within a reasonable degree of medical certainty that patient presently is temporarily totally disabled from gainful employment due to work related injuries." (*Id.* at 346).

On May 9, 2009, Saenz underwent an MRI of his left knee that revealed a small radial tear of the posterior horn lateral meniscus. (*Id.* at 341-42). On June 13, he underwent an MRI of his cervical spine that revealed broad-based disc protrusion with mild mass affect upon the thecal sac. (*Id.* at 328-29). On July 2, he underwent a nerve conduction test that revealed evidence of compression of the left motor ulnar nerve at the elbow, but no evidence of nerve damage. (*Id.* at 311, 313-14). Dr. Wortman recommended a second opinion evaluation by orthopedic surgeon Henry Toczylowski, M.D., and a trial of physical therapy. (*Id.* at 311).

Saenz saw a physical therapist at New Bedford Physical Therapy from July 8 through September 16, 2009, who noted "minimal progress in neck and back pain" and a slight improvement in strength. (*Id.* at 236).

On July 15, 2009, Saenz again saw Dr. Toczylowski, who noted that he walked with a marked antalgic gait, but had good flexion and stability. (*Id.* at 474). Dr. Toczylowski recommended a course of physical therapy. (*Id.* at 475). On August 7, 2009, Saenz underwent an MRI of his lumbar spine that revealed a broad-based posterior and right lateral disc bulge

with superimposed central protrusion contacting nerve roots, moderate neural foraminal narrowing, and mild spondylitic changes of the lumbar spine. (*Id.* at 301-02).[4]

On September 18, 2009, Saenz visited the St. Luke's Hospital Emergency room after being involved in a motor vehicle accident. He reported sharp pains in his neck, lower back, and left knee. He was released the next day with prescriptions for Oxycodone, Flexeril, and Ibuprofin. (*Id.* at 503-11).

On October 5, 2009, Dr. Toczylowski performed a CT scan on Saenz's left knee. The scan revealed a small loose body in the posterior knee joint near the popliteus tendon and small bone fragments at the medial and lateral margins of the patella. (*Id.* at 478). The scan did not show any marked abnormalities, and a bone scan was consistent with osteoarthritis. (*Id.* at 476).[5]

On October 23, 2009, Dr. Wortman noted that since neither physical therapy nor chiropractic therapy had helped Saenz improve, he was a good candidate for knee surgery. (*Id.* at 293). Dr. Wortman also requested authorization for an evaluation at St. Anne's Hospital Pain Center for spinal cortisone injections, which had not yet been approved. (*Id.*).

On November 25, 2009, Dr. Toczylowski noted that upon reviewing the results of Saenz's radiological scans, his reported pain seemed to "exceed what I am able to see on any of his studies," and that "none of these [injuries] should be causing him the severe difficulty" of which he complained. (*Id.* at 477). Dr. Toczylowski recommended an evaluation at a pain clinic and more therapy rather than surgery.

---

[4] Spondylitis is inflammation of one or more vertebrae. STEDMAN'S MEDICAL DICTIONARY 896, 1456 (25th ed. 1990).

[5] Osteoarthritis is a degenerative joint disease that may be secondary to trauma and may result in pain and loss of function. Stedman's Medical Dictionary 896, 1107 (25th ed. 1990).

Dr. Wortman, however, disagreed, because it did not appear to him that Saenz's back pain was improving. (*Id.* at 287). On January 20, 2010, Dr. Wortman requested authorization for a second opinion referral to Dr. Michael Ackland, another orthopedic surgeon. (*Id.* at 460). On March 19, that referral was approved. On June 14, 2010, Dr. Wortman noted that Dr. Ackland planned to operate on Saenz's knee. (*Id.* at 463). Dr. Wortman also noted that Saenz still remained "temporarily totally disabled." (*Id.* at 465).

On August 17, 2010, Dr. Ackland performed a left knee arthroscopic meniscectomy, chondroplasty, and removal of a loose body. (*Id.* at 623).[6] At a follow-up visit on August 27, 2014, Dr. Ackland noted that Saenz's gait was almost normal and that his pain had improved. (*Id.* at 630). On November 11, 2010, Dr. Wortman saw Saenz and noted that he had started physical therapy again and was using a cane for walking. (*Id.* at 643). Dr. Wortman again recommended a trial of spinal cortisone injections. (*Id.*). On December 9, 2010, he noted that Saenz had "reasonably less pain in the left knee," and was using the cane mostly for his back pain. (*Id.* at 645). On January 7, 2011, he noted that Saenz had been discharged from physical therapy, had completely recovered from the symptoms of numbness and pain in his left arm and elbow, and had come in without a cane for the first time. (*Id.* at 648). However, on April 4, 2011, Saenz again complained of pain in his neck, lower back, and left knee. (*Id.* at 654). He also reported that the pain center had recommended cortisone injections, which had not yet been approved. (*Id.*). On May 2, 2011, he was using a cane again because of worsening pain in his left knee. (*Id.* at 657). While on his medications, which included Oxycodone, Relafen, and Neurontin, Saenz rated his pain as a 4 out of 10. (*Id.* at 675).

---

[6] A meniscectomy is the removal of damaged meniscus cartilage in the knee. Stedman's Medical Dictionary 944, 1107 (25th ed. 1990). A chondroplasty is a reparative surgery of cartilage. *Id.* at 298.

7

On January 18, 2012, Dr. Wortman noted that he had received a letter from Saenz's worker's compensation insurance carrier stating that there was no evidence of any functional improvement. (*Id.* at 681). Dr. Wortman disagreed, stating that while Saenz was unable to return to work and was "not going to get any job considering his multiple injuries," he was able to get around, care for himself independently, and use his cane less often. (*Id.* at 682).

  C. <u>**RFC Opinions**</u>

On April 5, 2010, Mark Siegel, M.D., a state agency physician, completed a physical RFC assessment of Saenz. (*Id.* at 355-62). Dr. Siegel concluded that Saenz could occasionally lift and carry a maximum of twenty pounds, frequently lift and carry a maximum of ten pounds, stand and walk with normal breaks for a total of at least two hours in an eight-hour workday with an assistive device, and sit with normal breaks for a total of about six hours in an eight-hour workday. He also concluded that Saenz was limited in pushing and pulling with his upper and lower extremities, but could occasionally climb, balance, stoop, kneel, crouch, and crawl. (*Id.* at 356-57). He concluded that Saenz was limited in reaching overhead, and to occasional grasping and twisting with his left hand. (*Id.* at 358). Finally, he noted that Saenz ought to avoid driving, heights, hazardous machinery, and sharp instruments, and concluded that Saenz's "allegations appear partially credible." (*Id.* at 357-59).

On September 20, 2010, Harris Faigel, M.D., a state agency physician, completed a second RFC assessment. (*Id.* at 634-41). He noted the same exertional limitations that Dr. Siegel reported, but determined that Saenz could never (rather than occasionally) climb a ladder, rope, or scaffold. (*Id.* at 635-36). He noted that Saenz should avoid concentrated exposure to hazards such as machinery and heights. (*Id.* 638). He also noted that Saenz's statements

8

seemed credible. (*Id.* at 639).

On January 26, 2011, Roberto Feliz, M.D., a doctor with the Division of Industrial Accidents, performed an "impartial physician's examination" on Saenz. (*Id.* at 695-700). After examining Saenz and his medical record, Dr. Feliz concluded: "Mr. Saenz is permanently totally disabled from his left knee and permanently partially disabled as a whole body person. He may be able to perform modified and ideally sedentary work related activities. I clinically find very little additional physical limitation/disability from Mr. Saenz['s] cervical and lumber spine." (*Id.* at 700). He also stated that Saenz needs ongoing chronic pain management. (*Id.*).

### D. Hearing Testimony

At his hearing before the ALJ on March 15, 2012, Saenz testified that he has lower back pain that goes down to his left knee, along with pain in his neck and hips. (*Id.* at 36, 38). After a car accident in 2006, he had surgery on both his left knee and his left ankle, which continue to bother him. (*Id.* at 37, 48). During that surgery, screws were placed in his ankle, which cause him discomfort due to his size.[7] He had a second knee surgery in 2010. (*Id.* at 48). His pain levels as to his back and knee vary from day-to-day. (*Id.* at 43). Further, he started having problems with his left arm, which is his dominant arm, after the work-related injury. He continues to experience numbness and swelling in that arm and hand. (*Id.* at 50).

Saenz described his back pain as a sharp, stabbing sensation that radiates down his left leg. In order to relieve that pain, he sits in a recliner with his left leg raised at least two or three times per day. (*Id.* at 44, 53). He does not sleep well due to the pain, and wakes up to change his body positioning at various points throughout the night. (*Id.* at 45). He testified that he can

---

[7] Saenz weighs almost 250 pounds. (A.R. at 52).

only stand for twenty minutes before having to sit down, and can only sit for an hour at a time before his back starts to bother him. (*Id.* at 49). He also has trouble walking, getting dressed, showering, and performing household chores. (*Id.* at 173-74). However, his medication relieves the pain and lasts for about five hours. (*Id.* at 167).[8] He uses crutches, a cane, and a knee brace. (*Id.* at 178).

Saenz spends most of his time watching television or reading in his apartment, where he lives alone. A friend does his grocery shopping for him. (*Id.* at 47). He does not have a car and only leaves the house when necessary, but will go out if a friend or family member picks him up. (*Id.* at 168, 177). He sometimes goes to church with his family. (*Id.* at 172).

### E. **Evidence Added to the Record**

On May 14, 2013, the Appeals Council received two additional pieces of medical evidence, which it made part of the record. (*Id.* at 6). The first was a letter from Dr. Wortman to Saenz's attorney, in which he stated:

> It is my medical opinion to within a reasonable degree of medical certainty that your client is permanently and totally disabled from the labor force considering his multiple work related injuries. Considering the possibility of light duty work, I cannot make any comments once again because of limitations on standing and sitting and his very low education level.

(*Id.* at 704). He also stated that Saenz had developed chronic pain syndrome, which involves pain that lasts for more than six consecutive months. (*Id.*).

The second piece of evidence was an RFC assessment that Dr. Wortman completed on February 29, 2012. (*Id.* at 705-12). As to exertional limitations, he concluded that Saenz could occasionally lift and carry a maximum of ten pounds, frequently lift and carry a maximum of less

---

[8] Saenz reported taking Oxycodone/Percocets, Neurontin, and Relafen every day. (*Id.* at 224).

than ten pounds, stand or walk with normal breaks for less than two hours in an eight-hour workday, and sit with normal breaks for less than about six hours in an eight-hour workday. (*Id.* at 706). He noted that Saenz was limited in pushing and pulling with his lower extremities. (*Id.*). He also noted that Saenz could occasionally stoop, but could never climb, balance, kneel, crouch, or crawl. (*Id.* at 707).

### F.     Procedural History

Saenz filed applications for a period of disability insurance and supplemental security income benefits on December 8, 2009, alleging a disability onset date of April 14, 2009. (*Id.* at 134, 151). He appeared for a hearing before the ALJ on March 15, 2012. (*Id.* at 27-63). The ALJ concluded that Saenz was not disabled, and the Appeals Council denied his request for review on May 14, 2013. (*Id.* at 1-7, 10-22).

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ. It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143 (1st Cir. 1987). Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the [Commissioner] used the proper legal standards, and found facts based

11

on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Evidence is substantial "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Stanley v. Colvin*, 2014 WL 1281451 at *2 (D. Mass. March 28, 2014) (citing *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991)). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

### B. <u>Standard for Entitlement to SSDI Benefits</u>

An individual is not entitled to SSDI or SSI benefits unless he is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(A), (d) (defining "disabled" in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5)

12

if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[9] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At step five, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

C. **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4) in order to determine whether plaintiff had been disabled from April 14, 2009, his alleged disability onset date, through the date of the decision.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. (A.R. at 15).

At step two, the ALJ found that plaintiff has the following severe impairments: status post left knee arthroscopic chondroplasty and lateral meniscectomy, left ulnar neuropathy, cervical spondylosis with protrusion at C6-7, lumbar spondylosis with protrusion at L5-S1 with disc material touching the S1 nerve root without radiation, and obesity. (*Id.*).[10] Those

---

[9] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

[10] Ulnar neuropathy is a disorder affecting one of the three main nerves in the arm. Stedman's Medical Dictionary 944, 1107 (25th ed. 1990).

13

impairments limit the plaintiff's ability to perform some work-related activities, and thus can be considered "severe." (*Id.*).

At step three, the ALJ found that the plaintiff did not have an impairment that meets the severity level of one of the "listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). The ALJ stated that as to plaintiff's joint dysfunction and spine disorder, "[n]o treating or examining physician has proffered findings that are equivalent in severity to the criteria of these or any other listed impairment." (A.R. at 16).

At step four, the ALJ found that the plaintiff's RFC precludes him from performing any past relevant work. (*Id.* at 20). He found that plaintiff has the RFC to:

> lift 20 lbs occasionally and 10 lbs frequently, to stand or walk up to 4 hours over and 8 hour day, to sit 6 hours over an 8 hour day, with only occasionally pushing or pulling with the left upper extremity, with only occasional climbing, balancing, stooping, kneeling, crouching, or crawling, with a need to avoid climbing using ropes, ladders, or scaffolds, with only occasional reach overhead with either upper extremity, with only occasionally grasp, twist or handle with the left dominant hand and with a need to avoid concentrated exposure to hazards.

(*Id.* at 16). He found that the plaintiff's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible because they were inconsistent with his RFC assessment and with the record as a whole. (*Id.* at 19-20). He gave great weight to Dr. Faigel's assessment, and gave less weight to Dr. Siegel's assessment. (*Id.* at 20). He also gave less weight to Dr. Wortman's assessment because "the determination of whether a claimant is disabled under the regulations is reserved for the commissioner," and because Dr. Wortman's assessment was inconsistent with the record as a whole. (*Id.*). He also gave less weight to Dr. Feliz's assessment because it was "internally contradictory." (*Id.*).

At step five, considering plaintiff's age, education, work experience, and RFC in

conjunction with the Medical-Vocation Guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that jobs exist in significant numbers in the national economy that plaintiff can perform. (*Id.* at 21). He based his conclusion on a vocational expert's testimony at the hearing; the expert testified that given all the relevant factors, plaintiff "would be able to perform the requirements of representative occupations such as an informational clerk . . . which is unskilled in nature . . . and requires light exertion." (*Id.*). The expert also testified that plaintiff could perform work as a shipping and receiving weigher, which is unskilled in nature and requires light exertion. (*Id.* at 22). Both of those jobs are available in Massachusetts and the national economy. (*Id.* at 21-22).

### D. Plaintiff's Objections

Plaintiff contends that the ALJ's finding as to his RFC is not supported by substantial evidence. In particular, he contends that the ALJ's finding should be reversed or remanded for a further hearing because (1) the ALJ did not consider post-hearing evidence added to the record and (2) the ALJ failed to give controlling weight to the treating physiatrist's opinions.

#### 1. Consideration of Additional Evidence

Plaintiff first contends that the Appeals Council erred in failing to remand ALJ's decision when it learned that the ALJ did not consider the additional medical evidence from Dr. Wortman. Plaintiff further contends that when those additional documents are taken into account, the ALJ's decision is against the weight of the evidence.

When new and material evidence is submitted to the Appeals Council, it "shall evaluate the entire record including the new and material evidence . . . [and] will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight

15

of the evidence currently of record." 20 C.F.R. § 404.970(b).  The Appeals Council's decision to decline to review a case is only reviewable to the extent that it rests on an "explicit mistake of law or other egregious error." *Mills v. Apfel,* 244 F.3d 1, 5 (1st Cir. 2001).

It is well-established that when reviewing the ALJ's decision, the Court should not consider additional evidence that was never presented to the ALJ.  *Mills*, 244 F.3d at 4 ("To weigh the evidence as if it were before the ALJ would be . . . a very 'peculiar' enterprise . . . and to us one that distorts analysis.") (quoting *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)).  The Court may, however, consider the additional evidence to determine whether the Appeals Council was "egregiously mistaken" in refusing to review the ALJ's decision.  *Mills*, 244 F.3d at 5.

Here, the question is not whether the Appeals Council erred in failing to consider plaintiff's additional evidence.  The Appeals Council did assess that additional evidence, and decided that the evidence was consistent with the existing record, providing no basis for changing the ALJ's decision.  (A.R. at 2, 6).  That decision is entitled to "great deference," and is reviewable only if it rested upon an egregious error.  *Mills*, 244 F.3d at 6.

Plaintiff contends that when Dr. Wortman's additional evidence is added to the mix, the ALJ's decision is against the weight of the evidence.  The first additional piece of evidence was a letter to plaintiff's counsel from Dr. Wortman dated April 14, 2009.  In that letter, Dr. Wortman stated that plaintiff "is permanently and totally disabled from the labor force considering his multiple work related injuries." (A.R. at 704).  That statement is essentially cumulative; Dr. Wortman stated the same conclusion in almost every one of his examination reports, all of which were before the ALJ at the hearing.  (*See, e.g., id.* at 286, 289, 292, 462,

16

465, 560). The letter also mentions chronic pain syndrome and a possible need for a total knee replacement. (*Id.* at 704). In an examination report in the record dated February 20, 2012, Dr. Wortman stated that plaintiff suffered from chronic pain syndrome. (*Id.* at 687). In a report in the record dated January 26, 2011, Dr. Feliz predicted that plaintiff might need a total knee replacement at some point in the future. (*Id.* at 700). The Wortman letter also mentions the possibility of "post-traumatic arthropathy that can lead to progressive arthritis" in the near future. (*Id.* at 704). Such speculation about future impairments does not, however, relate to the period in question—namely, the date of the alleged disability onset and the date of the ALJ's decision. 20 C.F.R. 404.970(b) ("the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").

The second piece of additional evidence was Dr. Wortman's RFC assessment. (A.R. at 705-12). That assessment reported more physical limitations than the assessments of Dr. Siegel and Dr. Faigel; among other things, Dr. Wortman concluded that plaintiff could lift a maximum of only ten, rather than twenty, pounds. (*Id.* at 706, 356). But Dr. Wortman's RFC assessment does not render the ALJ's decision contrary to the weight of the evidence. The ALJ decided at step five that, according to the vocational expert, "representative occupations such as an informational clerk . . . which is unskilled in nature . . . and requires light exertion" existed in the national economy that plaintiff could perform. (*Id.* at 21). While Dr. Wortman's assessments of plaintiff's limitations are different from the limitations noted in the RFC assessments before the ALJ, such differences are immaterial because the plaintiff could still perform the types of sedentary jobs cited in the vocational expert's testimony.

17

Accordingly, the Appeals Council's assessment of the additional evidence and its decision to decline review of plaintiff's case was not an egregious error requiring reversal or remand.

### 2. Weight Assigned to Dr. Wortman's Opinion

Plaintiff next contends that the ALJ erred by failing to give controlling weight to the opinions of Dr. Wortman, as a treating source, and instead relying on Dr. Toczylowski's opinions. (Pl. Mem. at 8-9). Plaintiff contends that Dr. Wortman advocated "referral to an orthopedic surgeon for left knee surgery, referral for physical therapy, treatment with pain medications, and review of diagnostic testing," (Pl. Mem. at 9), and concluded that plaintiff was "permanently and totally disabled from gainful employment." (A.R. at 704).

The opinions of a treating source may be given controlling weight if "the treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R § 404.1527(c)(2); *Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007). Nevertheless, "the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians, as she is granted discretion to resolve any evidentiary conflicts or inconsistencies." *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include (1) the length of the treatment relationship, (2) whether the treating source provided evidence in support of the

opinion, (3) whether the opinion is consistent with the record as a whole, and (4) whether the treating source is a specialist. 20 C.F.R § 404.1527(c). The ALJ must "give good reasons in [his] notice of determination or decision for the weight [he gives the] treating source's opinion," and should not discount that opinion entirely. *Id.* However, opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R § 404.1527(d)(1).

The ALJ did not give Dr. Wortman's opinions controlling weight for two reasons. First, he found that Dr. Wortman's "assessments of disability [were] inconsistent with the medical treatment record as a whole." (A.R. at 20). Substantial evidence supports that determination. Dr. Toczylowski stated that the results of plaintiff's medical imaging and examinations did not support the degree of pain of which plaintiff complained. (*Id*. at 460-62). That statement was based on objective evidence, while Dr. Wortman's treatment notes describing plaintiff's pain levels were based on subjective complaints. An ALJ "is not required to take a claimant's subjective allegations at face value." *Bianchi v. Sec'y of Health & Human Servs.*, 764 F.2d 44, 45 (1st Cir. 1985). Therefore, it was reasonable for the ALJ to afford Dr. Toczylowski's opinion more weight. *See Nobrega v. Barnhart*, 2006 WL 2358886 at *7 (D. Mass. Aug. 3, 2006) (citations omitted).

In addition, Dr. Faigel and Dr. Siegel, both state-agency consultants, found in their RFC assessments that plaintiff could perform a limited range of light work and was not totally disabled. (*See* A.R. at 355-62, 634-41); *see also Conte*, 472 F. Supp. at 48 ("the hearing officer may opt not to give controlling weight to the treating source if the hearing officer finds the doctor's opinion inconsistent with other substantial evidence in the record"). Because the ALJ

cited substantial evidence in the record that was contrary to, or at least inconsistent with, Dr. Wortman's opinions, the ALJ fulfilled his burden under 20 C.F.R. § 404.1527(d)(2) to provide valid reasons for affording diminished weight to those opinions. *See Conte*, 472 F. Supp. 2d at 49 ("[s]ubstantial evidence exists for the hearing officer's decision to weigh consistency as the dispositive factor in diminishing the weight of [licensed therapist's] evaluation.").

Second, the ALJ properly declined to give controlling weight to Dr. Wortman's assertion that plaintiff was totally disabled from the workforce, because that determination is expressly reserved to the Commissioner. 20 C.F.R § 404.1527(d)(1). Dr. Wortman's conclusion in that regard thus has little probative value.

In summary, the ALJ's stated reasons for his determination that Dr. Wortman's opinions were not entitled to controlling weight are reasonable and well-supported by record evidence. That determination accordingly will not be reversed.

## III. Conclusion

For the foregoing reasons, the plaintiff's motion for an order to remand and reverse the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion for an order to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 21, 2014